IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JAMES FANKHAUSER,

      Plaintiff,

v.                        CASE NO. 2:05-cv-00922

Michael J. Astrue,
Commissioner of Social Security[1],
      Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court is Plaintiff's Motion for Summary Judgment. Defendant has filed a Brief in Support of Judgment on the Pleadings.

Plaintiff, James Fankhauser (hereinafter referred to as "Claimant"), filed an application for DIB on January 21, 2003, alleging disability as of August 8, 2002, due to a back impairment,

---

[1] On February 1, 2007, the United States Senate confirmed the nomination of Michael J. Astrue as the Commissioner of Social Security. Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Michael J. Astrue is automatically substituted as the defendant in this action.

hip pain, asthma and depression. (Tr. at 136-38, 160.) The claim was denied initially and upon reconsideration. (Tr. at 111-15, 119-21.) On October 23, 2003, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 122.) The hearing was held on January 7, 2004, before the Honorable Theodore Burock. (Tr. at 51-84.) A second administrative hearing was held on September 10, 2004. (Tr. at 85-108.) By decision dated April 21, 2005, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-40.) The ALJ's decision became the final decision of the Commissioner on September 23, 2005, when the Appeals Council denied Claimant's request for review. (Tr. at 9-12.) On November 21, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2005). If an individual is found "not disabled" at any

2

step, further inquiry is unnecessary. Id. § 404.1520(a). The
first inquiry under the sequence is whether a claimant is currently
engaged in substantial gainful employment. Id. § 404.1520(b). If
the claimant is not, the second inquiry is whether claimant suffers
from a severe impairment. Id. § 404.1520(c). If a severe
impairment is present, the third inquiry is whether such impairment
meets or equals any of the impairments listed in Appendix 1 to
Subpart P of the Administrative Regulations No. 4. Id. §
404.1520(d). If it does, the claimant is found disabled and
awarded benefits. Id. If it does not, the fourth inquiry is
whether the claimant's impairments prevent the performance of past
relevant work. Id. § 404.1520(e). By satisfying inquiry four, the
claimant establishes a prima facie case of disability. Hall v.
Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts
to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th
Cir. 1983), and leads to the fifth and final inquiry: whether the
claimant is able to perform other forms of substantial gainful
activity, considering claimant's remaining physical and mental
capacities and claimant's age, education and prior work experience.
20 C.F.R. § 404.1520(f) (2005). The Commissioner must show two
things: (1) that the claimant, considering claimant's age,
education, work experience, skills and physical shortcomings, has
the capacity to perform an alternative job, and (2) that this
specific job exists in the national economy. McLamore v.

Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 17.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of lumbar root syndrome, borderline intellectual functioning, depressive disorder and generalized anxiety.  (Tr. at 17.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 17.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 17.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 39.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as presser, handkerchief, mail clerk and marker, which exist in significant numbers in the national economy.  (Tr. at 37.)  On this basis, benefits were denied.  (Tr. at 38.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Cellebreze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was forty-eight years old at the time of the administrative hearing. (Tr. at 55.) Claimant quit school during the tenth grade. (Tr. at 57.) In the past, he worked as a coal miner and as a hospital maintenance man. (Tr. at 70-71.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

<u>Evidence before the ALJ</u>

On August 17, 2000, Claimant underwent an evaluation at Bone and Joint Surgeons, Inc. Claimant reported chronic back pain over

a several-year period that had recently worsened following a work place injury.  Following the injury Claimant reported radiation of pain to both hips.  Motor strength, hip flexion-extension, abduction, knee flexion, extension, ankle plantar and dorsiflexion, great toe extension and heel and toe walking were all within normal limits.  An MRI on May 16, 2000, showed slight bulging at L4-5 and L5-1 with no significant narrowing.  The physician concluded that Claimant had a mild degree of desiccated degenerative disc at L4-5 and L5-S1 and recommended mobilization exercises.  No restrictions in Claimant's activities were recommended.  (Tr. at 214.)

Claimant underwent another MRI on August 4, 2001, which showed mild degenerative changes and mild bulging of the annulus fibrosis of several intervertebral discs, but no evidence of a herniated nucleus pulposus or spinal stenosis.  (Tr. at 216.)

On August 9, 2001, Luis A. Loimil, M.D. examined Claimant in connection with his workers' compensation claim.  Claimant's chief complaint was right knee pain following an injury in 1999.  Dr. Loimil concluded that Claimant had a strain/sprain of the knee with some chronicity.  Dr. Loimil opined that Claimant was not disabled as a result of this injury, particularly since he was working at the time of the injury.  For workers' compensation purposes, Dr. Loimil opined that Claimant had a four percent whole person impairment.  (Tr. at 225.)

On October 1, 2001, Gai L. Smythe, M.D. examined Claimant in

connection with his workers' compensation claim. Claimant was working at the time of this examination. Claimant reported a history of low back pain following an injury two years before. Dr. Smythe noted significant amplification of symptoms as noted by mildly positive bilateral Hoover's test and DeBurn's test. Dr. Smythe diagnosed mild osteoarthritis, degenerative disc disease, and significant muscle tautness due to lack of stretching. Dr. Smythe recommended that Claimant slowly increase physical therapy to improve his range of movement. (Tr. at 230.)

On October 8, 2001, Joseph E. Fernandes, M.D. examined Claimant in connection with his workers' compensation claim. Claimant reported a back injury in July of 1999. Claimant complained of continued dull low back pain present most of the time and worse on lifting heavy objects. Claimant was working at the time of this examination. (Tr. at 233.) Dr. Fernandes diagnosed status post acute lumbosacral strain and chronic low back syndrome. (Tr. at 236.) Dr. Fernandes recommended a six percent whole person impairment for workers' compensation purposes. (Tr. at 238.)

On October 10, 2001, R.L. Short, D.O. examined Claimant at the request of his counsel. Dr. Short noted a 1999 back injury and a 1998 knee injury. Dr. Short diagnosed right knee strain, chondromalacia of the patella and acute/chronic lumbar strain. Dr. Short recommended a five percent whole person impairment for workers' compensation purposes. (Tr. at 252.)

7

On February 25, 2002, F. Joseph Whelan, M.D., M.S. examined Claimant, and issued a report on May 6, 2002. Dr. Whelan diagnosed adjustment disorder with mixed features and post traumatic stress disorder on Axis I and made no Axis II diagnosis. He rated Claimant's GAF at 43. He opined that Claimant's permanent partial disability for workers' compensation purposes was seventy percent. (Tr. at 267.)

Claimant underwent an MRI of the lumbar spine on September 16, 2002, which showed no abnormalities. (Tr. at 269.)

Claimant underwent normal nerve conduction velocity studies on or around November 11, 2002.

Constantino Y. Amores, M.D. examined Claimant on September 19, 2002. Claimant reported low back pain and loss of bowel control. The neurological examination showed no neurological deficit. Dr. Amores diagnosed chronic lumbar strain, intermittent lumbar root syndrome, anxiety disorder and depression. Dr. Amores opined that "non-surgical treatment would be the better option" and should include "drastic reductions in activity to minimize aggravating the problem." (Tr. at 274.) Dr. Amores noted that the history of urinary and fecal incontinence did not fit Claimant's signs, symptoms and MRI findings. (Tr. at 274.)

Kelly Rush, M.A., supervised by Dale M. Rice, M.A., examined Claimant at the request of the State disability determination service on April 24, 2003. Ms. Rush diagnosed adjustment disorder

with mixed anxiety and depressed mood on Axis I and made no Axis II diagnosis. (Tr. at 290.) Claimant's social functioning was within normal limits. Attention, concentration, persistence and pace were within normal limits. (Tr. at 290.)

The record includes treatment notes from Robert B. Atkins, M.D. dated September 1, 2000, through April 28, 2003. (Tr. at 294-320.) On September 1, 2000, Claimant saw Dr. Atkins for follow up of his low back pain. Claimant continued to work and functioned adequately. Dr. Atkins instructed Claimant to undergo physical therapy. (Tr. at 320.) On October 9, 2000, Dr. Atkins referred Claimant to a pain clinic after physical therapy did not help Claimant's condition. (Tr. at 319.) On February 9, 2001, Claimant reported that he reinjured his back. Dr. Atkins diagnosed lumbar strain and prescribed Vicodin and Celebrex. (Tr. at 318.) On February 14, 2001, Claimant reported his pain was thirty to forty percent better. Dr. Atkins instructed Claimant to return to work. (Tr. at 317.) On February 26, 2001, Claimant reported feeling much better and that he had returned to work. (Tr. at 316.) On February 27, 2001,[2] Claimant's back pain was exacerbated following a prolonged car ride. (Tr. at 315.) On April 6, 2001, Claimant reported doing about the same after his recent strain injury. Dr.

_____

[2] This treatment note is dated 2002, but it appears from the order of the treatment notes and the referral in the subsequent treatment note in April 2001, to the exacerbation of Claimant's back injury, that 2002 was a typographical error and that the year should have been 2001.

9

Atkins encouraged Claimant to continue his exercises. (Tr. at 314.) On June 1, 2001, Claimant reported low back pain with radiation into the left leg. Claimant continued to work. Dr. Atkins again recommended a pain clinic evaluation. (Tr. at 313.) On July 3, 2001, Claimant's condition was unchanged. Dr. Atkins ordered an MRI. (Tr. at 312.) On December 18, 2001, Claimant reported feeling somewhat better. Claimant reported feeling less anxious and coping better with his chronic low back pain. Dr. Atkins diagnosed depression, secondary to low back pain. (Tr. at 311.) On January 21, 2002, Claimant's condition was unchanged. (Tr. at 310.) On February 27, 2002, Claimant reported stiffness in certain activities, but that his condition was otherwise unchanged. Dr. Atkins prescribed Celexa, Daypro and Lorazepam. Dr. Atkins was at a loss as to what to suggest for treatment. He noted Claimant was evaluated at a pain clinic and conservative measures were recommended. (Tr. at 308.) On June 25, 2002, Claimant continued to complain of chronic back pain radiating into his left leg. Claimant also complained of hip pain. Claimant continued to work but reported significant difficulty working. Dr. Atkins diagnosed low back pain and "cannot r/o pain in the left hip joint area." (Tr. at 307.) He ordered a left hip x-ray. (Tr. at 307.)

On August 8, 2002, Dr. Atkins noted that Claimant's pain was worse. Claimant reported he had been to the emergency room and received a Toradol injection, which helped for about a day. Dr.

Atkins told Claimant to take Vioxx and remain off work.  Dr. Atkins told Claimant he could return to work if he felt up to it, but otherwise was to remain off work for the remainder of the next week and then see him after that.  (Tr. at 306.)  On August 23, 2002, Claimant reported that he had pain in his legs and feet and was having trouble sleeping.  Claimant reported that Vioxx helped a little.  Claimant stated that his claims worker for workers' compensation purposes indicated an orthopedic consultative examination would be arranged.  Dr. Atkins noted that Claimant had had a number of MRIs in the past, none of which had identified the specific cause of Claimant's persistent symptoms.  Claimant had been off work for two weeks now.  Dr. Atkins prescribed Ambien.  He noted Claimant would remain off work.  (Tr. at 305.)

On September 10, 2002, Claimant reported fecal incontinence on two occasions.  The physical examination was unchanged.  Dr. Atkins recommended an MRI.  (Tr. at 304.)  On September 20, 2002, Dr. Atkins noted that Claimant had been seen recently by a neurosurgeon, Dr. Amores, who did not recommend surgical intervention.  Dr. Atkins noted that a recent MRI showed no significant abnormalities.  Dr. Atkins recommended that Claimant increase his activity through physical therapy.  (Tr. at 303.)  On September 27, 2002, Claimant underwent a Toradol injection.  (Tr. at 303.)  On October 8, 2002, Claimant reported he was unable to lift his right foot.  Claimant stated that he had reported this to

11

Dr. Amores.   On examination, the right calf about 15 centimeters below the patella was 37 centimeters, while the left calf was 36 centimeters at that level.  Dr. Atkins recommended an EMG.  (Tr. at 302.)   On November 1, 2002, Claimant complained of increasing problems with depression.  (Tr. at 301.)

On December 9, 2002, Dr. Atkins noted that an EMG was normal. Dr. Atkins again recommended that "given the relative absence of specific objective findings to explain all of these symptoms I felt that increasing his activities through a structured PT program would best be able to restore his function to an acceptable level." (Tr. at 300.)   On January 3, 2003, Claimant's condition was unchanged, though he continued to undergo physical therapy.  (Tr. at 299.)  On February 5, 2003, Claimant reported increasing burning type pain in his lower back, pain in the lateral thigh on the right and some cramping in the lower leg.  Claimant had been undergoing physical therapy and had experienced slight improvement.   Dr. Adkins gave Claimant a Toradol injection.  (Tr. at 298.)  On March 5, 2003, Claimant's condition was unchanged.  Claimant asked for referral to a psychologist because he recognized that he had an emotional problem related to his chronic pain and disability.  Dr. Atkins felt this was a good idea because "[w]e haven't been able to clearly identify exactly what is causing his persistent symptoms ...."  (Tr. at 297.)  On April 3, 2003, Dr. Atkins reported increased pain over the last few days.  Dr. Atkins noted that

Claimant experiences flare ups in his condition and that Claimant can go several days in a row when he does not need narcotic medication.  Dr. Atkins prescribed Neurontin.  (Tr. at 296.)  On April 17, 2003, Claimant requested that he be permitted to return to physical therapy.  Dr. Atkins had no objection to this, but indicated he would not want physical therapy to continue indefinitely in the absence of significant improvement.  Claimant also requested referral to a pain clinic.  Workers' compensation refused Claimant's request for a psychological consultative examination, but Dr. Atkins felt that Claimant had significant psychogenic features to his problem.  (Tr. at 295.)  On April 28, 2003, Dr. Atkins opined that Claimant had a "chronic and persistent problem that is disabling him from work."  (Tr. at 294.)

On May 7, 2003, Marcel Lambrechts, M.D. completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light level work with an occasional ability to climb, balance, stoop, kneel, crouch and crawl and a need to avoid concentrated exposure to vibration and hazards.  (Tr. at 322-29.)

On May 10, 2003, Robert Solomon, Ed.D. completed a Psychiatric Review Technique form and opined that Claimant's mental impairments were not severe.  (Tr. at 331-44.)

Karen Roberts, M.A. and Mary Sullivan-Walker, M.A. completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on June 3, 2003.  They rated Claimant's abilities as poor

to none in all areas.  (Tr. at 350-52.)

The record includes a treatment note from John D. Cook, D.O.
dated October 18, 2001.  (Tr. at 358.)

Dr. Cook completed a Medical Assessment of Ability to do Work-
Related Activities (Physical) on July 3, 2003.  Dr. Cook opined
that Claimant could lift ten pounds occasionally and less than ten
pounds frequently.  (Tr. at 354.)  He opined that Claimant could
stand for two hours in an eight-hour workday, thirty minutes
without interruption and sit three hours in an eight-hour workday,
thirty minutes without interruption.  He opined that Claimant
should never stoop, crouch or crawl.  (Tr. at 355.)  Claimant's
ability to handle, feel, push and pull were affected by his
impairments, and Claimant should avoid moving machinery,
temperature extremes, chemicals, dust, fumes and vibration.  (Tr.
at 356.)

The record includes treatment notes and other evidence from
Boone Memorial Hospital, Physical Therapy dated December 7, 2002,
through July 9, 2003.  (Tr. at 359-405.)

On July 24, 2003, Riaz Uddin Riaz, M.D., Karen Lynch Roberts,
M.A. and Mari Sullivan-Walker, M.A. examined Claimant related to
his complaints of anxiety and depression.  Claimant was diagnosed
with major depressive disorder, recurrent, severe and generalized
anxiety disorder and rule out disorder with agoraphobia on Axis I.
They deferred an Axis II diagnosis.  Claimant's GAF was rated at 55

14

to 60.  Claimant's prognosis was "guarded."  (Tr. at 409.)

On September 22, 2003, Uma Reddy, M.D. completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light level work with an occasional ability to climb, balance, stoop, kneel, crouch and crawl and a need to avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and hazards.  (Tr. at 411-18.)

On September 30, 2003, Michael E. Carter, Ph.D. completed a Psychiatric Review Technique form on which he opined that Claimant's mental impairments were not severe.  (Tr. at 420-33.)

On July 23, 2003, J.K. Lilly, III, M.D. of the Day Surgery Pain Management Center examined Claimant at the request of Dr. Atkins.  The Zung depression index suggested modest depression. The modified somatic perception questionnaire, coupled with the Zung depression index, suggested Claimant was likely to have somatoform pain presentation.  Claimant was volitionally unable to move the right foot with dorsiflexion, plantar flexion, inversion or eversion.  He walked with a cane, but was able to do modest heel and toe walking.  (Tr. at 444.)  Lasegue's straight leg raising was positive at 60 degrees on the left and 30 degrees on the right. Dramatic symptom amplification was evident with a Hoover's heel cradling test, which was significantly positive.  Dr. Lilly diagnosed chronic low back pain and somatoform pain presentation

and pain with psychological components. He recommended no intervention. (Tr. at 445.)

On August 21, 2003, Dr. Whelan examined Claimant and issued a report on September 29, 2003. Dr. Whelan diagnosed adjustment disorder with mixed features and post-traumatic stress disorder on Axis I and made no Axis II diagnosis. He rated Claimant's GAF at 39. (Tr. at 455.) Dr. Whelan opined that Claimant showed moderate restrictions in activities of daily living and maintaining social functioning, frequent deficiencies in concentration, persistence and pace and repeated episodes of deterioration or decompensation in work or work-like settings. Dr. Whelan opined that Claimant's "psychiatric and physical conditions and residuals, when taken together and correlated for the whole person, render him completely and permanently disabled for any type of substantial, gainful occupation he would otherwise be suited by age, education, training or work experience." (Tr. at 455.)

Dr. Whelan completed a Medical Assessment of Ability to do Work-Related Activities on September 19, 2003, and opined that Claimant had poor abilities in most areas. (Tr. at 450-52.)

Ms. Roberts, supervised by Ms. Walker, examined Claimant on November 24, 2003. On the WAIS-III, Claimant attained a verbal IQ score of 77, a performance IQ score of 78 and a full scale IQ score of 76. The scores were valid. Ms. Roberts diagnosed major depressive disorder, recurrent, severe with suicidal ideation, rule

16

out mood disorder due to chronic pain, generalized anxiety disorder, rule out anxiety disorder due to chronic pain and panic disorder without agoraphobia on Axis I and borderline intellectual functioning on Axis II. She rated Claimant's GAF at 55/60. Ms. Roberts opined that Claimant was "incapable of sustaining steady gainful employment of the light or sedentary type." (Tr. at 460.)

The record includes treatment notes from Dr. Riaz dated July 9, 2003, through November of 2003. (Tr. at 463-66.)

On October 31, 2003, Joseph Fernandes, M.D. examined Claimant in connection with his workers' compensation claim. Dr. Fernandes diagnosed status post lumbosacral strain and chronic low back pain syndrome with exacerbation of symptoms. Dr. Fernandes recommended referral to a pain clinic. (Tr. at 476.) He recommended a seven percent whole person impairment rating for purposes of workers' compensation. (Tr. at 477.)

On March 25, 2004, Kelly Rush, M.A., supervised by Lisa Tate, M.A., examined Claimant again following the administrative hearing and at the request of the State disability determination service. On the WAIS-III, Claimant attained a verbal IQ score of 62, a performance IQ score of 64 and a full scale IQ score of 60. The scores were deemed invalid. (Tr. at 490.) Ms. Rush diagnosed adjustment disorder with mixed anxiety and depressed mood on Axis I and borderline intellectual functioning (by record) on Axis II. (Tr. at 491.)

17

On March 25, 2004, Ms. Rush completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) and opined that Claimant had a marked restriction in the ability to make judgements on simple work-related decisions and moderate to slight restrictions in the remaining areas. (Tr. at 482-83.)

The record includes treatment notes from G. Montgomery Baylor, M.D. of the Day Surgery Pain Management Center. On October 28, 2003, Claimant underwent an L4-5 lumbar epidural steroid injection. (Tr. at 494.) On November 25, 2003, Claimant underwent another injection. (Tr. at 494.) On December 18, 2003, Claimant reported that the second epidural was more effective than the first. Claimant complained of numbness in his right toes and cold feet, which had improved with the second epidural. The diagnosis continued to be lumbar degenerative disc disease, lumbar radiculopathy and osteoarthritis. Additional injections were recommended. (Tr. at 493.) On February 24, 2004, Dr. Baylor requested re-authorization for steroid injections, as well as approval for a functional capacity evaluation, physical therapy and work hardening program. Claimant complained of low back and right leg pain. The neurological examination was normal. Dr. Baylor's impression was lumbar degenerative disc disease. (Tr. at 498.) On March 30, 2004, Claimant underwent another injection. (Tr. at 497.) On April 20, 2004, Claimant rated his last epidural as thirty to forty percent effective. There was no change in the

18

neurological examination.    Dr. Baylor's impression was lumbar radiculalgia, lumbar degenerative disc disease and impairment of activities of daily living.  (Tr. at 496.)  On July 12, 2004, Dr. Lilly saw Claimant.    Claimant's gait was wide based and nonantalgic.  Claimant had no muscle spasm or atrophy.  Straight leg raising was positive on the left at 60 degrees and on the right at 50 degrees.   Range of motion of the lumbar spine was volitionally reduced due to pain.  (Tr. at 499.)

By letter dated June 29, 2004, Dr. Atkins wrote that Claimant "has had chronic problems with low back pain related to degenerative disease of the spine.  I believe that he is totally and permanently disabled from reasonable gainful employment at this time."  (Tr. at 500.)

The record includes additional treatment notes from Dr. Atkins dated March 8, 2004, through July 16, 2004.  On March 8, 2004, Dr. Atkins found that Claimant was tender at the belt line at the midline and into the right buttock.    There was no spasm appreciated.  Claimant maintained a very guarded position and it was difficult to coax him into flexion.  Muscle strength of his upper extremity was rated at V/V.  No deficits were appreciated. There was some crepitus with range of motion in the right knee. Claimant had limited muscle function of the right foot, which was difficult to quantify.  There was some movement that was fleeting in nature.  On neurological examination, Claimant had equal DTRs.

Claimant had almost a stocking glove distribution of decreased sensation in both feet.  It was more noted over the first and second digits of the right foot.  Dr. Atkins diagnosed chronic low back pain with right lower extremity radiculopathy and depression. (Tr. at 507.)  On April 30, 2004, Claimant reported some transient relief for about two weeks following injections.  Claimant was prescribed Neurontin, Vioxx, Lorazepam and Vicodin.  Claimant was stable overall. (Tr. at 505.)  On June 12, 2004, Claimant reported left hand numbness.  (Tr. at 504.)  On June 17, 2004, Dr. Atkins noted that Claimant's cervical x-ray was normal, but that Claimant did not have Tinnel's or Phalen's signs.  (Tr. at 503.)  On July 16, 2004, Dr. Atkins noted than an EMG showed mild carpal tunnel syndrome on the left wrist.  (Tr. at 501.)

The record includes a treatment note from Ms. Walker dated July 29, 2004, indicating that she provided service to Claimant on January 16, 2004, February 8, 2004, February 26, 2004, March 29, 2004, April 12, 2004, May 10, 2004, May 24, 2004, and July 7, 2004. She indicated that we "remain of the opinion he is incapable of sustaining steady gainful employment of even the light or sedentary type." (Tr. at 510.)

Claimant reported to the emergency room on September 3, 2004, with complaints of low back pain.  Claimant was seen by Dr. Cook. (Tr. at 513.)

On September 3, 2004, Dr. Cook completed a Medical Assessment

of Ability to do Work-Related Activities (Physical) and opined that Claimant could lift ten pounds occasionally and less than five pounds frequently. (Tr. at 517.)  He opined that Claimant could stand and/or walk for two hours in an eight-hour workday, fifteen minutes without interruption, and sit for two and a half hours in an eight-hour workday, thirty minutes without interruption. Claimant should never climb, stoop, crouch or crawl.  (Tr. at 518.) Claimant's ability to reach, handle, feel, and push/pull were limited.  Claimant had several environmental restrictions.  (Tr. at 519.)  Dr. Cook opined that Claimant was totally disabled.  (Tr. at 520.)  On September 3, 2004, Ms. Roberts and Ms. Walker completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on which they opined that Claimant's abilities were poor to none in all areas.  (Tr. at 521-23.)

Evidence before the Appeals Council

Robert L. Williams, M.A. conducted a vocational evaluation on May 13, 2005.  On the Slosson Intelligence Test, Claimant attained an IQ of 72, which was in the borderline classification.  Manual dexterity testing indicated poor use of the upper extremities.  Mr. Williams opined that "on the basis of his poor manual dexterity alone, the client is disabled for work in the labor market."  (Tr. at 532.)

On June 1, 2005, Dr. Riaz wrote that Claimant was last seen on April 27, 2005, with a diagnosis of major depression and

generalized anxiety disorder.   Claimant also reported panic attacks.   Dr. Riaz opined that Claimant was "incapable of sustaining steady gainful employment of the light or sedentary type." (Tr. at 538.)   Dr. Riaz completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on June 13, 2005, on which he rated Claimant's abilities as poor to none in all categories.   (Tr. at 543-48.)

The record includes treatment notes from Dr. Atkins and others in his office dated July 16, 2004, through May 18, 2005.   (Tr. at 550-62.)   On August 20, 2004, Dr. Atkins noted that Claimant's condition was about the same.   Claimant reported that his condition waxes and wanes, but that it was "under reasonable control." (Tr. at 561.) On December 29, 2004, Claimant reported that his pain had not changed.   Claimant had full range of motion in the lower extremities.   His DTRs were intact.   His gait was steady without ataxia. (Tr. at 557.)   On January 19, 2005, Claimant had a flare up in his back pain.   Claimant was in significant discomfort.   The assessment was chronic low back pain complicated by depression. (Tr. at 556.)   On April 26, 2005, Claimant reported going to the emergency room twice recently for back pain.   Claimant complained "of SLR pain bilaterally relatively low degree.   He complained [of] ... right leg pain even with his knees bent.   Evaluation of sensation revealed [an] inability to distinguish dull from sharp sensation over the entire right leg." (Tr. at 552.)   Dr. Atkins

planned to ask that Claimant be approved to undergo an MRI.  (Tr. at 552.)  On May 12, 2005, Claimant had increased pain and spasm of the left hand and forearm and a history of carpal tunnel disease. (Tr. at 551.)

The record includes emergency room records from Boone Memorial Hospital dated April 22, 2005, and April 23, 2005, for complaints of low back pain.  (Tr. at 567, 573.)

Claimant underwent a lumbosacral MRI on June 14, 2005, and was diagnosed with early stages of degenerative disc disease at all levels from L3 through S1, small subligamentous central herniated nucleus pulposus at L5-S1 and a mild generalized bulging of the annulus at L4-5.  (Tr. at 579.)

Dr. Cook completed a Medical Assessment of Ability to do Work-Related Activities (Physical) on April 22, 2005, and opined that Claimant could occasionally lift ten pounds and frequently lift less than ten pounds.  (Tr. at 580.)  Claimant could stand and/or walk two hours in an eight-hour workday, and for thirty minutes without interruption, sit for three hours in an eight-hour workday, thirty minutes without interruption.  Claimant should never climb, stoop, crouch or crawl.  (Tr. at 581.)  Claimant's ability to handle, feel, push/pull and see were affected by his impairments. Claimant had several environmental restrictions as well.  (Tr. at 582.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to afford controlling weight to the opinions of Claimant's treating sources; and (2) the ALJ failed to include in the hypothetical question, limitations related to Claimant's depression and anxiety. (Pl.'s Br. at 8-12.)

The Commissioner argues that (1) substantial evidence supports the ALJ's findings as to Claimant's physical limitations; (2) substantial evidence supports the ALJ's findings as to Claimant's mental limitations; and (3) the ALJ's hypothetical question included the mental limitations supported by the reliable medical evidence of record. (Def.'s Br. at 12-20.)

Weight Afforded the Opinions of Treating Sources

Claimant argues that the ALJ erred in failing to afford controlling weight to the opinions of Drs. Whelan and Riaz and Ms. Roberts and Ms. Walker and instead, incorrectly afforded controlling weight to the opinion of Dr. Carter, a nonexamining State agency medical source. (Pl.'s Br. at 9.) Claimant argues that Dr. Carter did not have all the records related to Claimant's mental condition. In addition, Claimant argues that the ALJ erred in relying on the report of Ms. Rush, which was based on a "10 minute examination." (Pl.'s Br. at 10.) Finally, Claimant suggests in sections of his brief other than the argument section,

that the ALJ also erred in rejecting the opinions of Claimant's treating physicians related to Claimant's physical impairments and resulting limitations.  (Pl.'s Br. at 4.)

The Commissioner argues that Claimant has waived any argument related to the ALJ's findings about Claimant's physical impairments.  According to the Commissioner, "Plaintiff has not directly addressed the issue of which medical opinions as to Plaintiff's physical limitations should have been given greater weight." (Def.'s Br. at 12.)  In the event the court reaches this issue, the Commissioner argues that the ALJ's finding that Claimant could perform a limited range of light work is supported by substantial evidence.  (Def.'s Br. at 12-14.)  The Commissioner further asserts that substantial evidence supports the ALJ's finding as to Claimant's mental limitations.  (Def.'s Br. at 14-19.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. § 404.1527(d)(2) (2005).  Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924

25

F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 404.1527(d)(2) (2005).

Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight generally is given to an examiner than to a non-examiner. Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." <u>Martin v. Secretary of Health, Education and Welfare</u>, 492 F.2d 905, 908 (4th Cir.

1974); <u>Hayes v. Gardener</u>, 376 F.2d 517, 520-21 (4th Cir. 1967).
Thus, the opinion "of a non-examining physician can be relied upon
when it is consistent with the record." <u>Smith v. Schweiker</u>, 795
F.2d 343, 346 (4th Cir. 1986) (more weight given to an opinion by
a specialist about issues in his/her area of specialty).

Regarding the weight afforded the opinions of record from
Claimant's treating mental health sources, the court proposes that
the presiding District Judge find the ALJ's explanation and the
weight afforded the evidence of record from these sources is
supported by substantial evidence.

In his decision, the ALJ provides an in depth analysis and
explanation regarding the weight afforded the evidence of record
related to Claimant's depression and anxiety and borderline
intellectual functioning. (Tr. at 27-36.) The ALJ's findings are
in keeping with the applicable regulation related to the evaluation
of mental impairments, 20 C.F.R. § 404.1520a (2005), as well as the
regulation and case law cited above related to the evaluation of
medical evidence.

In his decision, the ALJ determined that Claimant's borderline
intellectual functioning was a severe impairment, but that it did
not meet or equal Listing 12.05.  The ALJ determined that Claimant
suffered from severe anxiety and depression, and that these
conditions ultimately resulted in a mild limitation in daily
activities, mild difficulty in maintaining social functioning,

moderate difficulty in concentration and no episodes of decompensation for an extended duration. (Tr. at 33-35.) The ALJ reduced Claimant's mental residual functional capacity by a need for "routine repetitive work tasks that would not require him to attend to the work process to the extent that he would have to decide when and how to initiate changes. The claimant is also precluded from stressful work settings that might provoke panic symptoms." (Tr. at 36.) The ALJ included these and other limitations in the hypothetical question, in response to which, the vocational expert identified a significant number of jobs. (Tr. at 104-05.)

Contrary to Claimant's arguments, the ALJ did not ignore the opinions of Dr. Whelan, Dr. Riaz, Ms. Walker or Ms. Roberts. The ALJ weighed the evidence from each and every one of these sources, as well as Ms. Rush and Dr. Carter, among others. (Tr. at 29-36.)

Regarding Dr. Riaz, the ALJ noted his findings of major depressive disorder, generalized anxiety disorder and panic disorder (provisional). Dr. Riaz recommended treatment, but did not opine in the July 23, 2003, evaluation (along with Ms. Roberts and Ms. Walker) that Claimant was unable to sustain gainful employment due to his mental disorders. (Tr. at 30.) The ALJ observed that "Dr. Riaz's brief treatment notes are largely illegible, but it appears that as of October 22, 2003, the claimant was 'doing fairly well.' (Exhibit 37F). The claimant's failure to

submit updated treatment notes or summaries of treatment by Dr. Riaz to date suggests that the claimant is not being forthcoming with the progress of his treatment." (Tr. at 31.)

As to Dr. Whelan, the ALJ found no treating relationship with Dr. Whelan and instead found that his report in May of 2002, was in connection with Claimant's workers' compensation claim and entitled to little weight. The ALJ found that Dr. Whelan's opinion of total disability for workers' compensation purposes was an opinion reserved for the Commissioner. Furthermore, Dr. Whelan, who is a medical doctor, evaluated Claimant's physical condition, even though his report "does not indicate that the doctor had more than a superficial familiarity with the claimant's medical case (Exhibit 7F, p. 2). In May 2002 the claimant was still working and receiving a conservative course of treatment at the recommendation of a pain clinic. Dr. Atkins, who was following the claimant for both his medical and psychological treatment, had not suggested at that time that the claimant was unable to continue working. (Exhibit 13F, p. 15)" (Tr. at 30.) As to the second evaluation by Dr. Whelan, performed in August of 2003, the ALJ explained that there were several similarities between the first and second evaluation, suggesting that the second evaluation

> may not reflect changes in the claimant's condition, which is further indicated by other factors. The evaluation fails to mention panic attacks, about which the claimant had complained to Dr. Riaz a month earlier and continued to complain of at subsequent evaluations. Dr. Whelan reported that same medication regimen that the

claimant was taking in May 2002, although Dr. Riaz had just prescribed Elavil and Dr. Atkins had prescribed Neurontin (Exhibits 13F, p. 3, and 27F, p. 5).  Despite the lack of any significant new findings, Dr. Whelan assigned the claimant an even lower GAF score of 39 and opined that he was seriously limited in most areas of work-related mental functioning (Exhibit 23F).  A GAF score of 31 to 40 indicates some impairment of reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorder</u> 32 (Fourth Edition 1994)).  The second evaluation again confirms that the claimant's judgment and insight were intact and that the claimant did not exhibit any bizarre signs or symptoms such as delusions or hallucinations.  Social Security regulations measure the severity of a claimant's mental impairment(s) by assessing the degree to which the claimant's functioning is limited in certain areas, and in this evaluation, Dr. Whelan assessed the claimant's functioning in those areas.  However, the evaluation did not relate anything about the claimant's daily activities or social activities to demonstrate to what extent the claimant's functioning was limited.  Dr. Whelan's opinion that the claimant could be expected to show frequent deficiencies of concentration was contradicted by the contemporary treatment record.  The evaluation fails to indicate that ... Dr. Whelan was or had been a treating source.  For the foregoing reasons, the undersigned did not give any weight to Dr. Whelan's opinions.

(Tr. at 31.)

The ALJ considered the evidence from Ms. Roberts and Ms. Walker.  The evidence from these sources includes the following: Medical Assessment of Ability to do Work-Related Activities completed on June 3, 2003 (Tr. at 350-52); report joined in by Dr. Riaz on July 24, 2003 (Tr. at 406-09); report dated November 24, 2003 (Tr. at 457-60); mention in one treatment note dated July 29, 2004, that Claimant is incapable of sustaining steady, gainful

30

employment of even the light or sedentary type and that Ms. Walker provided treatment on January 16, 2004, February 8, 2004, February 26, 2004, March 29, 2004, April 21, 2004, May 10, 2004, May 24, 2004 and July 14, 2004 (Tr. at 510-11); and an assessment dated September 3, 2004 (Tr. at 521-23).

The ALJ explained that the first report is not supported by a treatment record or examination of the same or an earlier date. (Tr. at 31.)  The ALJ addressed the second report in his finding related to Dr. Riaz cited above.  Regarding the report dated November of 2003, the ALJ noted that the report found many of the same symptoms and clinical findings and that Claimant still was not receiving any psychotherapy from Ms. Roberts.  The ALJ rejected the opinion of Ms. Roberts that Claimant was incapable of work at the light or sedentary level, because "claimant's exertional capacity is not within Ms. [Roberts'] professional expertise.  The clinical findings of this second [sic third] evaluation in which Ms. [Roberts] participated do not support psychological symptoms of a severity that would prevent the claimant from performing substantial gainful activity, and Ms. [Robert's] conclusion is contradicted by the most recent treatment evidence from claimant's psychiatrist."  (Tr. at 32.)

The ALJ further found that

[i]n August 2004 Ms. [Roberts] reported that the claimant had been receiving psychotherapy sessions approximately monthly since December 2003 (Exhibits 27F, p. 7, and 37F).  Treatment of the claimant's psychological symptoms

31

was limited by the severity of the claimant's pain and
his excessive worry over his financial condition. The
claimant's anxiety and depression were exacerbated by
aggravation with Workers' Compensation. Ms. [Roberts]
opined that the claimant was incapable of sustaining
steady gainful employment. In a Medical Assessment of
Ability to Do Work-Related Activities (Mental), dated
September 3, 2004, Ms. [Roberts] assessed severe
limitations on the claimant's work-related mental
abilities (Exhibit 40F). Although the assessment and
opinions on the claimant's disability were based on a
treatment relationship, the undersigned cannot give them
significant weight. Ms. [Roberts'] opinions are not
supported by clinical or laboratory findings. The first
limitation that Ms. [Roberts] cited in the assessment
(poor memory and concentration) was admittedly based on
the claimant's self-report. The one example of the
claimant's functioning that Ms. [Roberts] offered in her
treatment summary six-weeks earlier was that the claimant
was capable of managing his finances (Exhibit 37F, p. 1).
The severity of Ms. Roberts's assessment is refuted by
the claimant's presentation at a consultative
psychological examination in March 2004, discussed below.
Furthermore, the medical record fails to support pain of
the severity alleged.

(Tr. at 32.)

In rejecting the opinion of Ms. Roberts, the ALJ refers to the

opinion of Ms. Rush. Ms. Rush examined Claimant on two occasions.

Upon objection from Claimant at the first administrative hearing

that Ms. Rush spent almost no time with Claimant, the ALJ "accepted

the evidence [of the first examination] as an exhibit but gave no

weight to the examiner's clinical findings. The claimant was

scheduled for another consultative psychological evaluation, which

took place in March 2004 (Exhibit 30F)." (Tr. at 29.) The ALJ

explained that the March 2004, examination by Ms. Roberts "was

under the supervision of Lisa C. Tate, a licensed psychologist.

32

(Exhibit 30F).  The claimant made no objection to the consideration of this evaluation."  (Tr. at 32.)

The ALJ further stated that he

considered all medical opinions of record, including the assessment of the State agency psychological consultants, who are non-examining medical experts (Exhibits 15F and 21F).  The undersigned adopted the opinions of the State agency consultant upon reconsideration, Dr. Michael Carter, a doctorate-level clinical psychologist (Exhibit 21F).  Although Dr. Carter did not examine the claimant, he showed that his opinions were well supported by the medical evidence of record at that time and consistent with the record as a whole.  His opinions continue to be supported by the clinical findings of the consultative examiner, Kelly Rush, who also concurred with Dr. Carter's diagnosis.  The record as a whole does not support the alleged severity of the claimant's psychological symptoms and suggests that the claimant has presented himself as more limited than he really is.

(Tr. at 32-33.)  Later, the ALJ observed that

[a]lthough any record is inherently representative, the record in this case is remarkable for the absence of a longitudinal treatment record or thorough evaluation from allegedly treating physicians - namely, Dr. Stollings, Dr. Cook, and Dr. Whelan. *** With respect to the claimant's mental impairment, there is no opinion of record from his treating psychiatrist that the claimant exhibits disabling psychologically-based symptoms. Although the claimant testified at the hearing in September 2004 that he continued to be under Dr. Ruiz's [sic; Riaz's] care, no treatment records dating after December 2003 were submitted from Dr. Ruiz [sic; Riaz]. For reasons discussed above, the undersigned finds Ms. [Roberts'] assessment, based on a course of psychotherapy since then, to be not well supported by medical evidence. In the absence of the concurring opinion of the claimant's psychiatrist, verifying a decline in the claimant's functioning, the undersigned finds the opinion of a psychological assistant to be less persuasive.

(Tr. at 36.)

The ALJ's findings are thorough and in keeping with the

33

applicable regulation and case law cited above related to the
weighing of medical opinions.  Claimant suggests in his brief that
the ALJ improperly relied on the first report by Ms. Rush as
consistent with the report of the non-examining State agency
source, Dr. Carter.  The ALJ did no such thing.  He clearly states
in his decision that he rejected the first report of Ms. Rush.
Furthermore, in explaining the weight afforded the evidence of
record, the ALJ clearly relies on the second report from Ms. Rush.

The ALJ also did not err in rejecting the opinions of Dr.
Whelan, Dr. Riaz and Ms. Roberts.  The evidence of record does not
indicate that Dr. Whelan, who opined that Claimant was totally
disabled considering both his physical and mental conditions, had
a treating relationship with Claimant.  Regarding Dr. Riaz, the ALJ
correctly indicated that Dr. Riaz did not opine that Claimant was
unable to sustain gainful work activity because of his mental
disorders.  Claimant submitted a report from Dr. Riaz to the
Appeals Council in which Dr. Riaz opined that Claimant was
disabled, however, Claimant again failed to provide treatment notes
from Dr. Riaz despite Dr. Riaz's statement in his June 2005, report
that Claimant was last seen on April 27, 2005.  Claimant also
submitted to the Appeals Council, a Medical Assessment of Ability
to do Work-Related Activities (Mental) from Dr. Riaz on which he
opined that Claimant's abilities were poor to none in most
categories.  His ratings are based largely on Claimant's reported

34

symptoms.   As such, they do not provide a basis for changing the ALJ's decision.   See Wilkins v. Secretary, 953 F.2d 93, 96 (4th Cir. 1991) (Where the Appeals Council specifically incorporates the evidence into the record, the court must review the record as a whole, including the new evidence, in order to determine if the Commissioner's decision is supported by substantial evidence.).

Regarding the ALJ's weighing of the medical evidence of record related to Claimant's physical condition, while the Commissioner asserts Claimant has waived this argument, the court finds the issue sufficiently raised in Claimant's brief.   The court has carefully reviewed the ALJ's findings in this regard and finds that they too are supported by substantial evidence and in keeping with the applicable case law and regulations cited above related to the weighing of medical evidence.

In short, in weighing the medical evidence of record, the ALJ considered and discussed in detail all the evidence of record.   The ALJ's analysis reflects careful consideration of the opinions of Claimant's treating sources and more than adequate explanation as to why those sources were not entitled to controlling weight.   The ALJ's analysis further reflects consideration of issues related to supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and

specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).  20 C.F.R. § 404.1527.

Thus, the court proposes that the presiding District Judge find that the ALJ properly weighed the medical evidence of record and, his findings are supported by substantial evidence of record.

Inadequate Hypothetical Question

Claimant next argues that the ALJ erred in failing to pose a hypothetical question that included all of Claimant's mental limitations.  Claimant argues that the ALJ "never placed any factors relating to mental impairment from either depression or anxiety in his hypothetical questions to the vocational expert." (Pl.'s Br. at 11.)

In response, the Commissioner asserts that the ALJ adopted significant limitations related to Claimant's mental impairments, including the need for only repetitive and routine tasks and a low stress environment excluding tasks such as piece rate work or commission sales.  (Def.'s Br. at 19-20.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989).  "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study

36

the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

As discussed above, the ALJ reduced Claimant's mental residual functional capacity by a need for "routine repetitive work tasks that would not require him to attend to the work process to the extent that he would have to decide when and how to initiate changes. The claimant is also precluded from stressful work settings that might provoke panic symptoms." (Tr. at 36.) In response to a hypothetical question including these and other limitations, the vocational expert identified a significant number of jobs. (Tr. at 104-05.) The above limitations fairly represent the limitations caused by Claimant's mental impairment and are supported by substantial evidence. The court proposes that the presiding District Judge so find.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge DENY the Plaintiff's Motion for Summary Judgment, AFFIRM the final decision of the

Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver, Jr.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

February 12, 2007
Date

Mary E. Stanley
United States Magistrate Judge